```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
IBRAHIM T. WAKIM,                                :
                                                 :
                        Plaintiff,               :    10 Civ. 0518 (PAC)(GWG)
                                                 :
           - against -                           :    ORDER
                                                 :
MICHAEL CETTA, INC. d/b/a SPARKS                 :
STEAKHOUSE and MICHAEL CETTA,                    :
                                                 :
                        Defendants.              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 17, 2012

HONORABLE PAUL A. CROTTY, United States District Judge:

On January 22, 2010, Plaintiff Ibrahim T. Wakim ("Wakim") brings this action against Defendants Michael Cetta, Inc. d/b/a Sparks Steak House ("Sparks") and Michael Cetta (collectively, "Defendants") alleging disability discrimination and retaliation in connection with Wakim's participation in a wage and hour lawsuit. Wakim seeks compensatory and punitive damages, and reinstatement to his position as a "runner" at Sparks, under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290, et seq., the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-10, et seq., the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq. and the New York Labor Law ("NYLL"), § 215.

On April 29, 2011, Defendants moved for summary judgment on all of Plaintiff's claims. The Court entered a preliminary order denying Defendants' motion on March 29, 2012. Upon reconsideration, and after hearing oral argument from the parties, the Court now amends its previous order. For the reasons discussed below, Defendants' motion for summary judgment is granted in part and denied in part.

## BACKGROUND

Ibrahim Wakim ("Wakim") was hired as a waiter at Sparks in 1976. (Def's 56.1 ¶ 2.) After one year as a waiter, he worked as kitchen manager at Sparks until 2001, when he was assigned the position of "runner." (Wakim Tr. at 13.) As a runner, Wakim was responsible for taking food from the kitchen to the dining room and serving customers. (Def's 56.1 ¶ 4.) The position required Wakim to lift heavy dishes and trays, and to carry them from room to room as well as up and down stairs. (Declaration of Timothy J. Pastore ("Pastore Decl."), Ex. E, at 3.) Wakim was assigned this position until September, 2009. (Id. ¶ 3.)

On June 14, 2006, a wage and hour class action lawsuit was filed against Sparks on behalf of its waiters asserting claims for unpaid tips and wages pursuant to the FLSA and the NYLL. See Duchene, et al. v. Michael Cetta, Inc., et al., 06 Civ. 4576 (PAC). On September 26, 2006, Wakim officially opted into the class suing Sparks. (Def's 56.1 ¶ 9) He continued to work for Sparks after joining the class, and it is undisputed that Defendants were aware of Wakim's participation in the Duchene litigation. (Id. ¶¶ 10-11.) Shortly after he joined the class, Wakim received a call from Marcia Cetta, the wife of Defendant Michael Cetta, who had been a personal friend for many years. (Michael Cetta ("M. Cetta") Tr. at 122-23.) Crying and upset, Marcia asked Wakim why he joined the class action, and she told him "[h]ow disappointed she was in him as a Catholic man [and] as a friend." (Steve Cetta ("S. Cetta") Tr. at 17; M. Cetta Tr. at 123.)

On October 11, 2006, two weeks after he joined the Duchene lawsuit, Sparks' management briefly assigned Wakim to the position of front waiter, a position he had not held since 1977. (Wakim Aff. ¶ 5.) As a front waiter, Wakim was required to take orders from customers, a task that had given him "severe anxiety and panic attacks." (Id.) Wakim contends

that Sparks' management knew he suffered these reactions while working as a front waiter in the past, and that he was given this position in October 2006 in retaliation for his involvement in the Duchene lawsuit. (Id.) The day after this reassignment, on October 12, 2006, Wakim's counsel sent a letter to Sparks' attorney expressing these concerns, and stating that Wakim was prepared to file a lawsuit alleging retaliation in the event that Defendants terminated Wakim. (Pechman Decl., Ex. 8.) After several days in the front waiter position, Sparks reassigned Wakim to work as a runner. (Wakim Aff. ¶ 5.)

On April 25, 2008, Wakim suffered injuries to his neck, back, and left shoulder while performing his duties at Sparks. (Def's 56.1 ¶ 12.) Dr. Douglas A. Schwartz treated Wakim for his injuries, and Wakim continued to work as a runner, without taking any medical leave. (Id. ¶ 13; Wakim Aff. ¶ 8.)

In September 2009, following a settlement in the Duchene litigation,[1] Sparks' management announced that it would require all of its waitstaff to rotate between the positions of runner and front waiter in order to equalize workload. (Def's 56.1 ¶¶ 15-16.) According to Sparks' manager, Valter Kapovic, this decision to rotate staff positions "was forced by [the Duchene] lawsuit that we had to treat everybody equal." (Kapovic Tr. at 7.) Michael Cetta's son, Steve, testified that Michael Cetta "was for" this new rotation policy. (S. Cetta Tr. at 49.) Wakim contends that there was nothing in the Duchene settlement that required this policy, and that Kapovic admitted the staff rotations "hurt" Sparks' business and were a "horrible mistake." (Kapovic Tr. at 11-12.) Wakim also asserts that Defendants exempted one waiter, Joanna

---

[1] On or about September 10, 2009, the Court approved a settlement between the parties in the Duchene litigation, which totaled approximately $3.1 million. (Def's 56.1 ¶ 14.) Pursuant to the settlement agreement, Wakim received a service payment of $10,000, as well as damages for back wages. (Declaration of Louis Pechman ("Pechman Decl."), Ex. 10, ¶ 13.)

3

Wejrowski, from the rotation policy because she was the only Sparks waiter who opted out of the Duchene litigation.

When the new rotation policy took effect, staff and managers at Sparks recognized that Wakim would be unable to perform the front waiter position "because of his anxiety." (Carlos Ponce Aff. ¶ 7.) Steve Cetta also testified that Wakim "had difficulty with the front waiter position" because he "was having trouble with the computers," which the front waiters were required to use. (S. Cetta Tr. at 14, 62.) Nevertheless, Wakim asserts that as of September 2009, he was still capable of working as a runner despite the pain he suffered from his prior injuries, and that he continued to work his regular shifts as a runner prior to September 2009. (Wakim Tr. at 100; Wakim Aff. ¶ 9.)

On or about September 14, 2009, Wakim visited Dr. Schwartz in connection with the injuries to his neck, back, and shoulder that he suffered in April, 2008. (Def's 56.1 ¶ 18.) Records reflect that during this visit, Wakim stated that as of the previous week he had "stopped working as a waiter or in any other work capacity" as a result of his injuries. (Pastore Decl., Ex. J at 1.) Dr. Schwartz indicated that he provided Wakim with a "[l]etter documenting total disability from any and all work."[2] (Id. Ex. J at 2.) Wakim notes that this evaluation was essentially the same as Dr. Schwartz's initial evaluation of him on June 11, 2009, when Dr. Schwartz observed that Wakim had "[p]ersistent left shoulder pain with intermittent stiffness and difficulty using the left arm for any repetitive lifting and carrying activities." (Pechman Decl., Ex. 11.) Records from Wakim's initial visit with Dr. Schwartz indicate that Wakim "continued to work after [his April 2008 accident] due to financial concerns."

On September 18, 2009, Wakim met with Dr. Jabbar Zafar, D.O. Notes of the visit indicate that Wakim complained of "psychosocial stressors related to work," and that Wakim

---

[2] This letter is not included with the parties' submissions.

4

was "constantly thinking about his job change and how he is physically as well as psychologically unable to meet the expectations and demands of being a waiter." (Pechman Decl. Ex. 15.) Wakim told Dr. Zafar that he "feels he could do his job as a runner, but could not fulfill the requirements of waitressing." (Id.)

On September 29, 2009, after returning from a vacation, Wakim met with Sparks' managers and gave them a written request that he be allowed to continue working as a runner. Wakim's letter stated that his physical and mental ailments precluded him from working as a front waiter. (Pechman Decl., Ex. 23.) As he explained: "While I believe the front-waiter position entails a level of lifting that I am currently unable to perform adequately due to my shoulder, hand, and back problems (as well as my anxiety), I am confident that I can continue to perform capably the duties of a runner." (Id.) Wakim enclosed a supporting letter from Dr. Zafar, dated September 22, 2009, which described his physical and mental disabilities and stated that Wakim "would be able to do a less physically demanding job such as a runner." (Pechman Decl. Ex. 21.) In response, Sparks' managers told Wakim that the new policy required all workers to rotate between the runner and front waiter positions. (Wakim Tr. at 61.) Defendants assert that Wakim stopped reporting for work after September 29, 2009, but Wakim contends that he was terminated as of that date. (S. Cetta Tr. at 61; Wakim Aff. ¶ 15.)

In October, 2009, Wakim applied for disability benefits from the Social Security Administration ("SSA"). (Def's 56.1 ¶ 35.) In his application, Wakim described his various medical problems and stated that he had stopped working on September 7, 2009 "[b]ecause of [his] condition(s)." (Pastore Decl., Ex. F.) In a Work History Report submitted with his application, Wakim stated that his duties as a runner involved "lift[ing] all heavy dishes, trays, silvers, cart (Gueridons) from room to others, upstairs [and] downstairs, carrying sometimes

heavy items as trays for the parties." (Pastore Decl., Ex. E)  He also checked a box indicating that he lifted as much as 20 pounds.  (Id.)    Wakim also completed a Function Report - Form SSA 3373, dated January 27, 2010, in which he stated that he "can't bend or shave or move my hand, shoulder," "go up stairs [and] down stairs" or "prepare food at all," and that he "can not lift, or bend down, or carry more than my small hand bags by forcing myself."  (Pastore Decl., Ex. G, at SSA 000254-255.)   During his deposition, Wakim testified that he no longer prepares his own meals "[b]ecause I cannot stand, I cannot move my hand, my neck, my back.  I am in pain, so I just leave it to my wife to take care of it as far I am at home [sic]."  (Wakim Tr. at 115:21-116:7.)

In its Notice of Award, the SSA determined that Wakim "became disabled under our rules on September 7, 2009."  (Pastore Decl., Ex. A.)  Wakim testified that he understood the SSA's determination of total disability meant that he was not capable of working.  (Wakim Tr. at 131:9-16.)  Wakim began to receive retroactive Social Security Disability Insurance (SSDI) benefits in March 2010 and continues to receive monthly benefits from the SSA.  (Id. at 131:21-132:6; Oral Argument Tr. at 28:8-12.)  He has not challenged SSA's determination of his disability status.  (Wakim Tr. at 132:10-16.)

## DISCUSSION

   A.  Standard of Review

Summary judgment may be granted where "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material if it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to

relief. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir.1995).

Once the moving party has made an initial showing that no genuine issue of material fact remains, the nonmoving party may not refute this showing solely by means of "[c]onclusory allegations, conjecture, and speculation," Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir.2003) (internal citations and quotations omitted), but must instead present specific admissible evidence in support of its contention that there is a genuine dispute as to material facts. Fed.R.Civ.P. 56(e). The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id.

B. Disability Discrimination Claims

Employment discrimination claims under the NYSHRL and NYCHRL are subject to the burden-shifting analysis applied to discrimination claims under Title VII. See Spiegel v. Schulmann, 604 F.3d 72, 80 (2d Cir. 2010). To state a *prima facie* case of employment discrimination due to a disability under both the NYSHRL and the NYCHRL, a plaintiff must demonstrate that: "(1) he was a member of a protected class; (2) he was competent to perform the job in question, or was performing the job duties satisfactorily; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that give rise to an

inference of discrimination." Id. If the plaintiff succeeds in establishing a *prima facie* case of discrimination, "a presumption of discrimination arises, and the burden shifts to the defendant, who must proffer some legitimate, nondiscriminatory reason for the adverse action." Id. The plaintiff must then establish that the defendant's legitimate reason is merely pretextual. See id.

"It is well-established that the statutory duty of a New York employer under [the New York State] Human Rights Law is to 'provide reasonable accommodations to the known disabilities of an employee . . . in connection with a job or occupation sought or held.'" Pimentel v. Citibank, N.A., 29 A.D.3d 141, 145 (1st Dep't 2006) (quoting Executive Law § 296 [3] [a]). Reasonable accommodation is defined as actions taken by an employer which "permit an employee . . . with a disability to perform in a reasonable manner the activities involved in the job or occupation sought or held . . . provided, however that such actions do not impose an undue hardship on the business." Executive Law § 292 [21-e]. An employee can prevail on a disability discrimination claim "by showing that she requested and was refused reasonable accommodations." Pimentel, 29 A.D.3d at 146.

  C. Judicial Estoppel

Defendants assert that they are entitled to summary judgment on Wakim's claims for disability discrimination because he is judicially estopped from arguing that he was qualified to perform the essential functions of a runner at Sparks in light of his contrary factual statements and submissions to the SSA. Defendants argue that Wakim made numerous representations to the SSA about purely factual matters in support of his application for disability benefits, and that those statements cannot be reconciled with Wakim's position in this case.

Judicial estoppel "prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by [that party] in a prior legal proceeding." Bates

8

v. Long Island R.R. Co., 997 F.2d 1028, 1037 (2d Cir. 1993).  The purposes of the doctrine are to "preserve the sanctity of the oath" and to "protect judicial integrity by avoiding the risk of inconsistent results in two proceedings."  Simon v. Safelite Glass Corp., 128 F.3d 68, 71 (2d Cir.1997) (internal quotation marks omitted).  Judicial estoppel will apply if: "1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." DeRosa, 595 F.3d at 103 (citing New Hampshire v. Maine, 532 U.S. 742, 749 (2001)).  "The prior inconsistent assertion need not be made to a court of law: statements to administrative agencies, such as to the Social Security Administration in applying for disability benefits, may also give rise to judicial estoppel."  Mitchell v. Washingtonville Central Sch. Dist., 190 F.3d 1, 6 (2d. Cir. 1999).

In Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795 (1999), the Supreme Court held that the SSA's determination that a person is "totally disabled" for its purposes does not automatically estop the recipient of SSDI benefits from pursuing an action for disability discrimination under the Americans with Disabilities Act ("ADA"),[3] where a plaintiff claims that with reasonable accommodation he could continue to perform the essential functions of his job.  Id. at 797.  As the Court explained, since the Social Security Act and ADA serve different purposes, the SSA does not consider issues of reasonable accommodation when it determines whether an individual is disabled for SSDI purposes.  See id. at 803.  Thus, "an ADA suit claiming that the plaintiff can perform her job *with* reasonable accommodation may well prove

---

[3] The same elements that must be established for a claim under the ADA are also required to support claims of disability discrimination under both the NYHRL and NYCRL.  Kinneary v. City of New York, 601 F.3d 151, 158 (2d Cir. 2010). Although the New York statutes apply a more liberal definition of disability than their federal counterpart, see Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001) ("[T]he definition of a disability under New York law is not coterminous with the ADA definition."), this distinction is not relevant for purposes of judicial estoppel analysis, as the inquiry concerns whether Wakim can now argue that he is qualified to perform the essential tasks of a runner in light of his prior contrary statements which he made in his application for SSDI benefits.  See Cleveland, 526 U.S. at 806.

9

consistent with an SSDI claim that the plaintiff could not perform her own job (or other jobs) *without* it." Id. (emphasis in original); see also Rodal v. Anesthesia Group of Onondaga, P.C., 369 F.3d 113, 123 (2d Cir. 2004) (holding plaintiff "is not judicially estopped from claiming that he was qualified to perform the duties of a Group anesthesiologist with reasonable accommodation by statements he made in earlier state court proceedings about the extent of his disability"); Montanez v. New York City Housing Authority, 5 A.D.3d 314 (1st Dep't 2004) ("[P]laintiff's general representations to the benefits agencies respecting his inability to work are not necessarily inconsistent with his present claims that, at least with a reasonable accommodation, he would have been capable of continuing to perform his job duties.").

But Cleveland did acknowledge that "in some cases an earlier SSDI claim may turn out genuinely to conflict with an ADA claim," such as where a plaintiff provides a sworn assertion in an application for SSDI benefits "that she is, for example, 'unable to work.' 526 U.S. at 805-806; see also id. at 802 (noting that "[this case does *not* involve . . . directly conflicting statements about purely factual matters, such as . . . 'I can/cannot raise my arm above my head'"). In such cases, a plaintiff alleging disability discrimination "cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim." Id. at 806. Rather, to survive summary judgment, the plaintiff "must proffer a sufficient explanation" to resolve the factual contradiction. Id. at 806-807; see also id. at 802 (noting that the Court's decision in Cleveland "leaves the law related to . . . purely factual[] kind of conflict[s] where we found it").

The Second Circuit applied this test in Mitchell and held that plaintiff was judicially estopped from asserting claims for disability discrimination under the ADA in light of the conflicting statements he previously made in his application for SSDI benefits. 190 F.3d at 7. In

10

<u>Mitchell</u>, plaintiff worked as a head custodian at a high school and wore a prosthetic leg after undergoing an amputation prior to his employment. See <u>id.</u> at 3. Within four months of starting work, the long hours spent on his feet caused pain and swelling in his right leg, and plaintiff became unable to wear his prosthesis. See <u>id.</u> He ultimately stopped reporting to work and filed for SSDI benefits, stating that he was "totally disabled and unable to engage in gainful employment due to being an amputee, my right leg from the knee down." <u>Id.</u> He further stated that his disability prevented him "from any type of prolonged standing or ambulation." <u>Id.</u> SSA determined that plaintiff was disabled under the Social Security Act and awarded him retroactive benefits. See <u>id.</u>

Plaintiff's employer then terminated him, since he had been unable to work for more than one year. See <u>id.</u> Following his termination, plaintiff sued under the ADA, and alleged that his employer failed to provide him with reasonable accommodation by restructuring the head custodian position to include sedentary duties. See <u>id.</u> In his deposition, however, plaintiff testified that around the time he filed his action, he was fitted with a new prosthesis which enabled him to remain on his feet and perform his duties as head custodian. See <u>id.</u> at 4-5. The Second Circuit held that based on plaintiff's prior statements in his application for SSDI benefits, plaintiff was "estopped from asserting [in his ADA action] that he was capable of performing work that required him to stand or walk." <u>Id.</u> at 7. The court explained that plaintiff's prior statements to the SSA—that he could not walk or stand for any length of time and that he required sedentary work—"clearly contradict Mitchell's position in this litigation that as of late 1994 he was able to stand and walk for a substantial portion of the work day." <u>Id.</u> The SSA "adopted" plaintiff's earlier statements "with a result favorable to Mitchell: an award of

11

benefits." Id.  As a result, "judicial estoppel prevent[ed] Mitchell from advancing, for purposes of [his ADA claim], the contrary position." Id.

Notwithstanding Mitchell's seemingly harsh result, it applies with equal force here, where the factual representations Wakim made to the SSA to support his claim of total disability contradict those he now makes in this case.  Wakim stated in his application for SSDI that he stopped working at Sparks on September 7, 2009 "[b]ecause of [his] condition(s)."  When describing his duties as a runner in his Work History Report, Wakim stated that he routinely "lift[ed] all heavy dishes, trays, silvers, cart (Gueridons) from room to others, upstairs [and] downstairs, carrying sometimes heavy items as trays for the parties," and that he lifted as much as 20 pounds.  In his Function Report, however, Wakim described how he no longer performs these tasks because the pain from his injuries has severely restricted his mobility.  Specifically, he stated that he "can't bend or shave or move my hand, shoulder," "go up stairs [and] down stairs" or "prepare food at all," and that he "can not lift, or bend down, or carry more than my small hand bags by forcing myself."  Wakim also noted that as a result of his injuries, he cannot lift more than five pounds of weight.  The SSA adopted Wakim's statements concerning his "total disability" and awarded him SSDI benefits retroactive to September 7, 2009.  Wakim fails to present a sufficient explanation to resolve the contradiction between his earlier representations to the SSA and those made in his discrimination action.[4]  Thus, to the extent that Wakim now takes a contrary position in this case and asserts that he can perform the essential functions of a

---

[4] At oral argument, counsel for Plaintiff stated that Wakim "never said that he could never do his job at Sparks.  It's always been his position that he could continue to do the position of runner."  (Oral Argument Tr. at 19:22-24.)  This argument ignores the record in this case, as Wakim stated unequivocally in his application for SSA benefits that he stopped working on Septmber 7, 2009 "[b]ecause of my condition(s)."  (Pastore Decl., Ex. F, at SSA 000019.) Indeed, the tasks he performed as a runner, which he listed in his Work History Report, (see Pastore Decl., Ex. E), are precisely the same tasks that Wakim told SSA he can no longer do.  (See Pastore Decl., Ex. G.)  Counsel's effort to cast Wakim's Function Report as relating to "social issues," such as shaving and cooking, rather than workplace limitations, is entirely misplaced, and his reliance on DeRosa v. Nat'l Envelope Corp., 595 F.3d 99 (2d Cir. 2010), is inapposite.

runner, he is judicially estopped from doing so.  See Mitchell, 190 F.3d at 7-8; Safelight Glass Corp., 128 F.3d at 73-74 (finding plaintiff was judicially estopped from asserting age discrimination claim based on statements made to SSA that his "condition" made him "unable to work," as those statements were "patently and admittedly contrary to his central claim in this case that he is able to work").

Since Wakim is judicially estopped from claiming that he can perform the essential functions of a runner at Sparks, and the reasonable accommodation he seeks is the very job which he told SSA he can no longer do, Wakim fails to state a *prima facie* case of employment discrimination under the NYHRL or NYCHRL.  His discrimination claims are therefore dismissed.

### D.  Retaliation Claims

FLSA provides that it is "unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under [FLSA]." 29 U.S.C. § 215(a)(3).  The NYLL provides similar protections for employees who engage in protected activity.  See N.Y.L.L. § 215.  Courts analyze FLSA and NYLL retaliation claims under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  To establish a prima facie case of retaliation, the plaintiff must show: (1) participation in a protected activity known to the defendant, such as the filing of a FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action.  Mullins v. City of New York, 626 F.3d 47, 53 (2d Cir. 2010); see also Higueros v. New York State Catholic Health Plan, Inc., 526 F. Supp. 2d 342, 347 (E.D.N.Y. 2007) (stating that under N.Y.L.L. § 215, "a plaintiff must adequately plead that while employed by the defendant,

he or she made a complaint about the employer's violation of the New York Labor Law and was terminated or otherwise penalized, discriminated against, or subjected to an adverse employment action as a result").  A plaintiff may prove a causal connection between participation in protected activity and an adverse employment action either by (1) evidence of retaliatory animus directed against a plaintiff by the defendant; or (2) a close temporal proximity between the protected activity and the adverse employment action.  Torres v. Gristedes Operating Corp., 628 F. Supp. 2d 447, 473 (S.D.N.Y. 2008).

After the plaintiff establishes a *prima facie* case of retaliation, the defendant must then articulate a "legitimate, non-discriminatory reason for the employment action."  Mullins, 626 F.3d at 53 (citation omitted).  If the defendant satisfies this burden, the plaintiff must present "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action."  Id. (citation omitted).

Defendants argue that they are entitled to summary judgment on Wakim's retaliation claims because the record does not show a causal connection between Wakim's participation in the Duchene litigation and Defendants' subsequent implementation of the rotation policy. Defendants do not dispute that Wakim's participation in the Duchene litigation was protected activity well known to Sparks' management when he joined the lawsuit in September 2006.  Nor do they challenge Wakim's contention that he was seriously disadvantaged when Sparks changed his position from runner to front waiter in September 2009.  Defendants assert, however, that Wakim has not satisfied the last element of his retaliation claims as a matter of law, since Sparks did not implement its rotation policy until three years after Wakim joined the class action lawsuit.

Although Defendants correctly assert that an adverse employment action taken twenty months after a plaintiff participates in a protected activity "suggests, by itself, no causality at all," Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001), on the facts of this case, Wakim raises an inference of causation sufficient to survive summary judgment. There are adequate grounds to find causation through proximity, if not retaliatory animus. First, Wakim contends that Defendants initially assigned him to work as a front waiter on October 11, 2006, in retaliation for having opted into the Duchene lawsuit merely two weeks earlier. That proximity is more than enough to establish that the protected activity and adverse employment action were "very close" in time. See Torres, 628 F. Supp. 2d at 474 (inferring causation on retaliation claim where adverse employment action occurred 28 days after protected activity); Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed., 444 F.3d 158, 168 (2d Cir. 2006) ("[T]he lapse of only several months after the letter and several weeks after the press conference between the protected speech and adverse employment action is sufficient to support an allegation of a causal connection strong enough to survive summary judgment."). Indeed, the next day after the proposed reassignment, Wakim's lawyer sent Sparks' attorney a letter warning that Wakim was prepared to file a lawsuit against Sparks alleging retaliation. Defendants abandoned the reassignment and returned Wakim to his position as a runner. Upon resolving the Duchene lawsuit, however, Defendants almost immediately introduced the new rotation policy, which they knew would have the same, dire consequences for Wakim. Normally, it would be difficult to argue that there is a causal connection given the temporal separation between the time of filing the Duchene lawsuit and the adverse employment action. On the unique facts of this case, however, at this time, it cannot be said that the two events are separate and unrelated.

Defendants argue that the rotation policy was not discriminatory, and that it was compelled by the Duchene litigation in order to equalize the workload of its waitstaff. Kapovic, however, testified that the staff rotations "hurt" Sparks' business and were a "horrible mistake," suggesting that Defendants did not implement the policy for a legitimate business reason. The rotation policy was also not evenly applied to all Sparks employees, as Defendants exempted Joanna Wejrowski, the only Sparks employee who opted out of the Duchene litigation. This fact strengthens the inference of retaliatory animus. Wakim has therefore established a *prima facie* case of retaliation under the FLSA and NYLL sufficient to survive summary judgment.

E. Personal Liability of Michael Cetta

Michael Cetta also argues that he is entitled to summary judgment because there is no evidence that he was personally involved in any discriminatory or retaliatory conduct against Wakim. Cetta contends that he cannot be held liable for any alleged violations of his corporation, and that there is no basis to pierce the corporate veil. Plaintiffs are not relying on a veil piercing theory to hold Cetta liable, however. Rather, they argue that Cetta is liable as an employer under section 203 of the FLSA, as well as under the NYLL.

Section 203 of the FLSA defines "employer" as including "any person acting directly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d). The NYLL adopts a similarly broad definition of employer, which encompasses any "person employing any [employee]." N.Y. Lab. Law § 2(6); see also N.Y. Lab. Law § 651(6). The remedial nature of the FLSA "warrants an expansive interpretation of its provisions so that they will have the widest possible impact on the national economy." Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999) (internal quotation and citation omitted). To that end, "[i]ndividual corporate officers or owners who are responsible for the corporation's obligations may be deemed

'employers' under the FLSA." Samboski v. Linear Abatement Corp., No. 96 Civ. 1405, 1999 WL 739543, at *3 (S.D.N.Y. Sept. 22, 1999) (citation omitted). Since courts give consistent interpretations to both the federal and state labor statutes, whether Cetta is an "employer" under the FLSA will therefore apply equally to whether he is an employer under the NYLL. See Wilk v. VIP Health Care Servs. Ltd., No. 10 Civ. 5530, 2012 WL 560738, at *6 n.9 (E.D.N.Y. Feb. 21, 2012) (citations omitted).

Here there is no dispute that Michael Cetta was the co-owner of Sparks, and that he was in charge of approving Sparks' general policies and employee salaries. As he testified in connection with a previous wage and hour lawsuit, Cetta made the "ultimate decision" with respect to compensation issues at Sparks. (Pechman Decl, Ex. 3, at 30:7; see also id. at 29:16-18 ("I'm entitled to do what I want and pay people what I want to pay them, over and above the legal salaries.").) In addition, Steve Cetta testified that Michael discussed the rotation policy with him and that Michael "was for it." (S. Cetta Tr. at 49.) Cetta is therefore personally liable as an employer under the FLSA and NYLL, and Defendants' motion for summary judgment is denied on this issue. See Samboski, 1999 WL 739543, at *3 (holding president and sole owner of corporation liable in his individual capacity as an "employer" under the FLSA where he exercised operational control over the company, was responsible for hiring and firing decisions, and certified the payroll).

## CONCLUSION

For the reasons discussed, upon reconsideration, the Court amends its previous order of March 29, 2012. Defendants' motion for summary judgment is granted as to Plaintiff's claims of disability discrimination. Plaintiff's first and second claims alleging discrimination under the NYSHRL and NYCHRL are therefore dismissed. The Court denies Defendants' motion for

summary judgment as to Plaintiff's third and fourth claims alleging retaliation under the FLSA and NYLL. The parties are directed to submit a case management plan by Friday, June 1, 2012.

Dated: New York, New York
     May 17, 2012

SO ORDERED

_Paul A. Crotty_

PAUL A. CROTTY
United States District Judge