Louis Pechman (LP-6395)
Jessica N. Tischler (JT-1582)
Berke-Weiss & Pechman LLP
488 Madison Avenue - 11th Floor
New York, New York 10022
(212) 583-9500
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
IBRAHIM T. WAKIM,                                    :
                                                     :
                          Plaintiff,                 :
                                                     :        10 Civ. 0518 (PAC)
          -against-                                  :
                                                     :
MICHAEL CETTA, INC. d/b/a SPARKS                     :
STEAK HOUSE, and MICHAEL CETTA,                      :        ECF CASE
                                                     :
                          Defendants.                :
------------------------------------------------------------------------X


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 3

ARGUMENT ......................................................................................................... 13

POINT I

PLAINTIFF'S FLSA AND NYLL RETALIATION CLAIMS MUST BE
ALLOWED TO PROCEED BECAUSE DEFENDANTS CANNOT SHOW,
AS A MATTER OF LAW, THAT PLAINTIFF WAS NOT
DISADVANTAGED BY DEFENDANTS' REFUSAL TO EXEMPT HIM
FROM THE ROTATION POLICY ....................................................................... 13

POINT II

PLAINTIFF HAS ACTIONABLE DAMAGES FROM DEFENDANTS'
REFUSAL TO EXCUSE HIM FROM THE ROTATION POLICY ............................... 16

    A. Wakim is Entitled to Mental Anguish Damages Under
       the FLSA and NYLL ............................................................................... 16

    B. Even If Plaintiff Has No Compensatory Damages, He Is Still Entitled To
       Punitive Damages ................................................................................... 17

       a. The Cases Cited By Defendants Are Inapplicable .......................... 17

       b. Punitive Damages Are Available Under The FLSA Even Where
          Compensatory Damages Are Not Awarded ................................... 18

CONCLUSION ...................................................................................................... 21

# TABLE OF AUTHORITIES

## CASES

*Action House v. Koolik,*
    54 F.3d 1009 (2d Cir. 1995) ................................................................................18

*Artica v. J.B. Custom Masonry & Concrete, Inc.,*
    2012 U.S. Dist. LEXIS 103272 (E.D.N.Y. Jul. 16, 2012) ......................................17

*Avitia v. Metropolitan Club,*
    49 F. 3d 1219 (7th Cir. 1995) ................................................................................17

*BMW of N. Am. v. Gore,*
    517 U.S. 559 (1995).............................................................................................20

*Burlington N. & Santa Fe Ry. Co. v. White,*
    548 U.S. 53 (2006).............................................................................................15

*Chevron Corp. v. Donziger,*
    No. 11 Civ. 0691 (LAK), 2012 U.S. Dist. LEXIS 107693 (S.D.N.Y. July 31, 2012) ..............15

*Cush-Crawford v. Adchem Corp.,*
    271 F.3d 352 (2d Cir. 2001) ................................................................................18

*DeRosa v. Nat'l Envelope Corp.,*
    595 F.3d 99 (2d Cir. 2010) ................................................................................14

*Do Yea Kim v. 167 Nail Plaza,*
    No. 05 CV 8560(GBD), 2008 WL 2676598 (S.D.N.Y. 2008)................................16

*Duchene v. Michael Cetta, Inc. d/b/a Sparks Steak House and Michael Cetta,*
    06 Civ. 4576 (PAC) (GWG) ................................................................................1

*Garrity v. Lyle Stuart, Inc.,*
    40 N.Y.2d 354 (N.Y. Ct. App. 1976) ..................................................................20

*King v. Macri,*
    993 F.2d 294 (2d Cir. 1993)

*Lai v. Eastpoint Int'l, Inc.,*
    99 CIV 2095 (DLC), 2002 WL 265148 (S.D.N.Y. 2002) ......................................17

*Mullins v. City of New York,*
    626 F.3d 47 (2d Cir. 2010) ................................................................................15

*Moore v. Freeman,*
    355 F.3d 558 (6th Cir. 2004)................................................................................17

*New Hampshire v. Maine,*
    532 U.S. 742 (2001)...................................................................................................14

*Perez v. Jasper Trading, Inc.,*
    05-CV-1725 (ILG)(VVP), 2007 WL 4441062 (E.D.N.Y. 2007) ..............................17

*Robinson v. Cattaraugus County*, 147 F.3d 153, 161 (2d Cir. 1998)..............................18

*Shea v. Galaxie Lumber & Constr. Co.*, 152 F.3d 729, 736 (7th Cir. 1998) ...................20

*Sines v. Serv. Corp. Int'l.,*
    No. 03 Civ. 5465, 2006 U.S. Dist. LEXIS 82164 (S.D.N.Y. Nov. 8, 2006)............19, 20

*Smith v. Nagai,*
    10-CV-8237, 2012 WL 2421740 (S.D.N.Y. 2012)...................................................16

*Smith v. Wade,*
    461 U.S. 30 (1983)..................................................................................................20

*Snapp v. Unlimited Concepts, Inc.,*
    208 F.3d 928 (11th Cir. 2000) ..................................................................................20

*Ting Yao Lin v. Hayashi Ya II, Inc.,*
    No. 08-CV-6071, 2009 WL 289653 (S.D.N.Y. 2009) ..............................................16

*Travis v. Gary Community Mental Health Center,*
    921 F.2d 108 (7th Cir. 1990) ...............................................................................19, 20

*Virgilio v. City of New York,*
    407 F.3d 105 (2d Cir. 2005) ....................................................................................17

## STATUTES

29 U.S.C. § 215(a)(3)

29 U.S.C. §216(b) (2000)...................................................................................................19

## SECONDARY SOURCES

*Prosser & Keeton on the Law of Torts* § 2, at 14 (5th ed. 1984).....................................18

*Restatement (Second) of Torts* § 908 cmt. (c) (1979) .....................................................18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
IBRAHIM T. WAKIM,                              :     10 Civ. 0518 (PAC)
                                               :
                          Plaintiff,           :     PLAINTIFF'S
                                               :     MEMORANDUM OF LAW
     -against-                                 :     IN OPPOSITION TO
                                               :     DEFENDANTS' MOTION
MICHAEL CETTA, INC. d/b/a SPARKS               :     FOR SUMMARY
STEAK HOUSE, and MICHAEL CETTA,                :     JUDGMENT
                                               :
                          Defendants.          :     ECF CASE
------------------------------------------------------------------------X

   This Memorandum of Law is submitted on behalf of plaintiff Ibrahim T. Wakim

("plaintiff"), in opposition to defendants Michael Cetta, Inc. d/b/a Sparks Steak House,

and Michael Cetta's ("Defendants" or "Sparks") Motion for Summary Judgment.

**INTRODUCTION**

   All that Ibrahim Wakim wanted to do when he came to work at Sparks Steak

House on September 29, 2009 was to perform the same job as a runner that he had

performed for the last nine years.  Although he was in pain and severely limited in his

physical functions, Wakim always managed to do his job as a runner at Sparks, and by

all accounts, he did that job well.

   Instead Wakim, a 31-year employee, a work-horse returning from his first

"vacation" in four years, was not permitted to return to his job as a runner.  According

to Sparks, Wakim had to work as a front waiter due to a new rotation policy that was

allegedly required by the case of *Duchene v. Michael Cetta, Inc. d/b/a Sparks Steak House

and Michael Cetta*, 06 Civ. 4576 (PAC) (GWG)  - - a case that was Wakim's idea to bring.

However, the *Duchene* case had nothing to do with the distinction between the front

waiter and runner positions.  Rather, that case principally involved "waiters" in the

kitchen who never provided service to Sparks' customers and therefore should not have been given a cut of the tip-pool at Sparks.

According to Sparks, the new rotation policy, which required all waiters to work as both runner and front waiter, applied to everyone and they did not want to open a "Pandora's box" by allowing an exception for Wakim.  But, there was one exception to the policy.  Joanna Wejrowski, the **only** Sparks waiter who opted out of the *Duchene* case, did not have to work as a runner.

Although one would assume that Sparks had a business reason for requiring Wakim to perform the front waiter function, despite the general awareness that Wakim experienced panic attacks when he was previously assigned to that role, such an explanation has no been provided.  In fact, Manager Valter Kapovic ("Kapovic") testified "I would have loved to" have brought Wakim back to the runner position and that the rotation system was a "horrible mistake" and a "bad thing" for the business.

Given this framework of shifting and inconsistent explanations, it would not be difficult for a jury to conclude that Wakim was denied the same accommodation as was given to Wejrowski (*i.e.*, exclusion from the rotation system) because of Wakim's leadership in the *Duchene* case.

Faced with the absence of any legitimate business justification for its refusal to allow Wakim to continue as a runner and an animosity against Wakim that made the wife of owner Michael Cetta weep, Sparks attempted to turn the focus of this case on Wakim's application for social security benefits.  In the cruelest of turnabouts, Sparks rests its case on the fact that Wakim was forced to apply for social security disability four months after he was pushed out of his job at Sparks.  Even though Wakim's disabilities were caused by his work at Sparks and even though he worked at Sparks through incredible pain, Sparks takes the position that Wakim is precluded from

2

bringing his retaliation claims because he filed for disability benefits after he was terminated.

Wakim's January 2010 social security application, however, was necessitated by Sparks' refusal to allow Wakim to work with his disabilities in his former job as runner. In the absence of the position at Sparks, there was no other work that this 62 year-old, disabled runner was going to get in any other restaurant -- particularly after being terminated from a position he had held for 31 years with the same employer. The termination by Sparks was a devastating blow to Wakim and his family and a clear act of retaliation for his participation in *Duchene*. Left with no source of income as a result of Defendants' unlawful actions, Wakim should not now be deemed to have waived his right to damages for Defendants' retaliation solely because four months after his termination from Sparks Wakim sought social security benefits -- the only alternative source of income left to him.

## STATEMENT OF FACTS

Wakim was an excellent "runner" and recognized at Sparks as one of the hardest workers at the restaurant. Ponce Aff., ¶8. According to Sparks' Manager Valter Kapovic, Wakim "was a good employee," had "great personality," his honesty was never questioned, and he had no problems "whatsoever" with Wakim's job performance. (Kapovic Dep., T. 12, 13, 21, 53)[1] Even Steve Cetta, co-owner and son of Michael Cetta, conceded that Wakim was a hard worker and effective in the job that he performed. (S. Cetta Dep., T. 33)

---

[1] References to "[Name" Dep., T. ___," are to the deposition testimony of witnesses are annexed to the declaration of Louis Pechman as follows: Pechman Ex. 1, April 14, 2011 deposition of Valter Kapovic; Pechman Ex. 2, March 9, 2011 deposition of Steve Cetta; Pechman Ex. 3, February 21, 2008 deposition of Michael Cetta (from *Arama et al. v. Michael L. Cetta, Inc. d/b/a Sparks Steak House, et al.*, 06 Civ. 8721); Pechman Ex. 4, March 28, 2008 deposition of Abdou Elsahbeiny(from *Arama et al. v. Michael L. Cetta, Inc. d/b/a Sparks Steak House, et al.*, 06 Civ. 8721); Pechman Ex. 7, October 9, 2006 deposition of Michael Cetta (from *Arama et al. v. Michael L. Cetta, Inc. d/b/a Sparks Steak House, et al.*, 06 Civ. 8721); Ex. 5, March 8, 2011 deposition of Ibrahim T. Wakim.

Wakim was recognized by both employees and management of Sparks as the "inside" contact for plaintiffs' counsel during the three years of the *Duchene* litigation. Indeed, it was Wakim's idea to bring a lawsuit against Sparks. Because Wakim was working at Sparks at the time, and feared retaliation, he enlisted Gerald Duchene, a former employee, to become the lead plaintiff. (Wakim Dep., T. 25-26)

On September 26, 2006, Wakim's opt-in form for the FLSA collective was filed, and he officially became a party to the *Duchene* lawsuit. (Pechman Decl., Ex. 6). On September 28, 2006, when Marcia Cetta (wife of Michael Cetta and mother of Steve Cetta) learned of Wakim's involvement in the *Duchene* lawsuit, she called Wakim crying, and told Wakim "you broke my heart," that she was disappointed in him "as a Catholic man," and that, as a result of joining the lawsuit, he was going to lose his job. (Wakim Dep., T. 69; M. Cetta Dep., Oct. 9, 2006, T. 122-123; S. Cetta Dep., T. 17-18)

On October 11, 2006, just two weeks after joining the lawsuit, Wakim was assigned to the position of front-waiter, taking orders from customers. It was common knowledge at Sparks that Wakim had severe anxiety and panic attacks on the few occasions in the past when he was assigned to function as a front waiter. (Wakim Dep., T. 74-75; Wakim Aff., ¶5) The reassignment of Wakim to the front waiter position lasted for several days at which point he was returned to the runner position after the intervention of Wakim's counsel and the threat of a retaliation suit. (Pechman Decl. Ex. 8; Wakim Aff.,¶5.)

On September 2, 2009, in anticipation of the Fairness Hearing on the *Duchene* settlement, the plaintiffs in *Duchene* requested that Wakim receive a service payment in the amount of $10,000 in recognition of his efforts made on behalf of the class. In support of this service payment, Louis Pechman, counsel for the class, stated as follows in his Declaration to the court:

> 50.     Ibrahim Wakim, who was working as a waiter at
> Sparks through the course of this litigation, also stayed in
> regular contact with me and jeopardized his employment
> with Sparks in order to keep me informed and help
> prosecute the Lawsuit.  He was an indispensable source as to
> what was happening *vis-à-vis* the case within the restaurant.

> 51.     In sum,…Wakim played a crucial role in ensuring
> that I was kept apprised of events occurring at Sparks with
> regard to the claims in the Lawsuit and helping to formulate
> case strategy.

(Pechman Decl., Ex. 9)

On September 10, 2009, the Court held a fairness hearing at which Judge Crotty

approved the settlement in the *Duchene* case, awarding the plaintiffs and class members

$3.15 million.  Pursuant to the settlement in that case, Wakim received $51,152.06 in

back wages and damages and a $10,000 service payment approved by the Court in

recognition of his assistance in litigating the wage action.  (Pechman Decl., Ex. 10)

In the beginning of September 2009, and as the *Duchene* case was concluding,

management of Sparks announced that it would require all of its waitstaff to rotate for

weekly stints between the positions of runner and front-waiter.  (S. Cetta Dep., T. 38, 42-

43)  Prior to September of 2009, there were two waiter functions at Sparks, one being the

front waiter and the second being a runner.  (Kapovic Dep., T. 8-9; S. Cetta Dep., T.43)

According to Kapovic, the decision in the fall of 2009 to require waiters to work

as front waiters and runners "was forced by [the *Duchene*] lawsuit that we had to treat

everybody equal," and if there never was a lawsuit there would have been no reason

"whatsoever" to change Sparks' policy.  (Kapovic Dep., T. 7, 11-12)  Indeed, according

to Kapovic (who was Sparks' 30(b)(6) witness on this issue) Wakim could not return to

work as a runner because of the lawsuit:

> Q.  So as we sit here today, it's your testimony that the only
> reason why Mr. Wakim couldn't come back to work as a
> runner was because of the lawsuit?

A.  Right

(Kapovic Dep., T. 9, 41, 43-44).  Nonetheless, Kapovic did not know what it was in the

*Duchene* lawsuit that required front waiters and runners to rotate:

> Q.  Did the Duchene lawsuit complain that staff was not rotated, to your knowledge?
>
> A.  I don't know that, sir

(Kapovic Dep., T. 8-9).  Kapovic only knew that he was "forced to make

the rotation."  (Kapovic Dep., T. 9)

There was simply no legitimate business purpose for the rotation system.

Indeed, Kapovic's "business preference," was to have the old system of designated

runners and designated front waiters. (Kapovic Dep., T. 10)  In fact, Kapovic testified

that the forced rotation system "hurt" Sparks' business and was a "horrible mistake"

and a "bad thing." (Kapovic Dep., T. 11-12)

Kapovic even testified that he "would be happy to accommodate Mr. Ibrahim to

work in the kitchen" and would have "loved" to return Wakim to the runner position.

(Kapovic Dep., T. 9, 26)

The failure to even consider having Wakim perform the same job he had done

effectively for the past nine years stands in sharp contrast to Sparks' liberal

accommodation of other employees.  Steve Cetta stated "we would bend over

backwards" to help any employee in response to a reasonable accommodation request,

and according to Steve Cetta, Sparks "always" was "100 percent behind helping [the

employees], if they need it."  (S. Cetta Dep., T. 36, 53, 60)  Indeed, in his runner position,

Wakim was frequently helped by his co-workers with lifting the guerridon up and

down the stairs, and Mr. Wakim had a number of friends at Sparks, with whom he

worked together. (Kapovic Dep., T. 33-34)

Inexplicably, Steve Cetta gave contradictory testimony, testifying that if he knew about Wakim's medical condition, he would have been "happy to work with him" and would have granted Wakim's accommodation request if Wakim had only provided documentation. (S. Cetta Dep., T. 89-91)  As noted by Steve Cetta, "nothing is written in stone."  (S. Cetta Dep., T. 91)  The truth is, however, that Wakim's anxiety at performing the front-waiter function was well known. (Ponce Aff., ¶7, 8)  According to Steve Cetta, "As of 2006 . . . Wakim had difficulty with the front waiter position because . . . it was his worry of the computers, using computers." (S. Cetta Dep., T. 14)  Consequently, Steve Cetta was well aware that Wakim could not perform the duties of a front waiter:

> Q.  And you understood that because of his worries of computers, he couldn't do the front waiter position?
>
> A.  Yes.

(S. Cetta Dep., T. 14).  *See also* S. Cetta Dep., T. 62 ("the only thing I really understood was that he was having trouble with the computers.")

In September of 2009, Wakim was capable of performing the runner position notwithstanding the pain he suffered.  (Wakim Dep., T. 100)  *See also* Wakim Dep., T. 89 ("You can give me the advice of not working, but if I got to go and work as a runner because of some reasons, nobody – [Dr. Schwartz] won't be able to stop me.")  In this regard, although from a strictly medical point of view Wakim may not be able to perform certain duties of the runner position without pain, he always worked through the pain, and with the assistance of his co-workers, performed the job of runner:

> If -- look, I got a lot of help from my friend not to do it by myself, which I try sometimes because, you know, when you do a job, you cannot say to your friend, please do it, do it, and then at the end of the day you have to collect the same money.  So I do have a lot of friend and they tried to help me and say, "Please, don't go downstairs.  We'll do it."  Sometimes I force myself.  Why?  You have no choice because you are the only one who provide food to your

> family and I cannot be dependent 100 percent.  So I used to
> take all the pain and do it, and sometimes they put me -- my
> friend say, "Please, stay here.  Don't do it.  Don't do the
> lobster.  You cannot do it from your fingers."  Because they
> tried to help me, but sometimes I force myself to do it.

(Wakim Dep., T. 109-110); *See* also Wakim Aff., ¶8.

Although Sparks rests its case on Dr. Schwartz's note that Wakim was disabled, that determination is nothing new and is the same type of entry that Schwartz had while Wakim was working in pain.  Indeed, Dr. Douglas Schwartz's initial evaluation of Wakim on June 11, 2009 noted "[p]ersistent left shoulder pain with intermittent stiffness and difficulty using the left arm for any repetitive lifting and carrying activities, and left-side lying positions cause interrupted sleep."  The initial evaluation noted that despite his pain, Wakim "continued to work . . . due to financial concerns."  (Pechman Decl., Ex. 11).  Wakim's visits to Dr. Schwartz on July 17 and 31, 2009, and his visit to Dr. Richard M. Seldes, a Board Certified Orthopedic Surgeon confirms that despite his significant disabilities, Wakim was working in pain, under medication. (Pechman Decl., Ex. 12,13, 14)  Despite the documented pain, Wakim continued to work his regular shifts at Sparks throughout the months of July and August. (Wakim Aff. ¶9)

On September 18, 2009, Wakim visited Dr. Zafar.  Dr. Zafar's file note from that visit documented Wakim's physical and mental disabilities and also Wakim's statement that "he could do his job as a runner" at Sparks.  Dr. Zafar's "History" of Wakim noted:

> The patient states that he feels he could do his job as a
> runner, but could not fulfill the requirements of waitressing
> [*sic*].

Dr. Zafar noted during this visit that Wakim had: "Multiple physical handicaps related to cervical, lumbar, and discogenic disease as well as history of post concussion syndrome and trigger finger," and "Adjustment Reaction."  Dr. Zafar further noted Wakim's "Anxiety, and Panic induced by the prospect of returning to work" and

recommended starting Wakim on Zoloft and Klonopin. (Pechman Decl., Ex. 15)

Notwithstanding Wakim's physical disabilities, Manager Kapovic and Steve Cetta both believed that as of September 29, 2009, Wakim was qualified to perform the runner position. (Kapovic Dep., T. 48; S. Cetta Dep., T. 54) Indeed, Steve Cetta testified that when he read the letter dated September 22, 2009 from Dr. Zafar he did not believe that Wakim was disabled.  (S. Cetta Dep., T. 23)  Kapovic also testified that he did not believe that Wakim had any medical limitations "because he was capable of doing everything, and I would have accommodate him, and if it's up to me, I would have still loved to have him in Sparks." (Kapovic Dep., T. 54).  These observations are testaments to Wakim's ability to work through his pain and give 100% to his employer.

Steve Cetta claimed that it would open "a Pandora's box." (S. Cetta Dep., T. 80). But Steve Cetta acknowledged that he would approve a reasonable accommodation request in other circumstances:

> Q.  I appreciate that, but the bottom line depending on the circumstances, Sparks could bend the rules and allow a front waiter to be a runner for a couple of weeks or vice versa, have a runner be a front waiter for a few weeks, correct?
>
> A.  Yes

(S. Cetta Dep., T. 86-87).  Steve Cetta accommodated waitress Joanna Wejrowski because "she's old" and "a little frail." (S. Cetta Dep., T. 79)  Notably, Wejrowski was the only employee at Sparks who filed an Exclusion Request in the *Duchene* litigation seeking to be excluded from the class.  (Pechman Decl., Ex. 18)  Steve Cetta claimed that he made an accommodation for Wejrowski, but did not make an accommodation for Wakim because "he didn't show up for work." (S. Cetta Dep., T. 79-80)

On September 22, 2009, Wakim's physician at the Family Health Center Capital Health Systems, Jabbar Zafar, D.O., sent Sparks a letter describing Wakim's physical

and psychological conditions.  (Pechman Decl., Ex. 19; Wakim Dep., T. 55-56)  In his

September 22, 2009 letter, Dr. Zafar recommended the following accommodation:

> I feel that it would be medically unacceptable for him to
> return to a physically demanding job such as being a front
> waiter given his extensive neck and back problems as well as
> the anxiety and panic that he is experiencing now.  I do feel
> that he would be able to do a less physically demanding job
> such as a runner.

(Zafar Aff., Ex. 2)  Dr. Zafar's letter concluded with the following request:

> If you have any questions please feel free to call us at the
> Family Health Center # 609-275-0487.

(Pechman Decl., Ex. 2).  Despite this request, Kapovic did not call Dr. Zafar's office with

any questions, and never asked Dr. Zafar to provide any further information.  (Kapovic

Dep., T. 24; Zafar Aff., ¶ 6.)  Moreover, neither Kapovic nor any other manager at

Sparks even bothered to ask Wakim what his physical limitations were.  (Kapovic Dep.,

T. 50-51)

Kapovic saw Wakim's requests for the reasonable accommodation, and he did

not have any questions about any of his letters or doctor's notes.  (Kapovic Dep., T. 52).

Kapovic testified that the *only* problem Kapovic had with Dr. Zafar's letter was the lack

of letterhead. (Kapovic Dep., T. 29)

No one from Sparks ever called Dr. Zafar, and no one from Sparks ever

requested additional information from Wakim about the disabilities that are described

in the September 22, 2009 letter.  (S. Cetta Dep., T. 21-22)  Instead, after Steve Cetta read

the request for accommodation dated September 22, 2009, he immediately turned it

over to Sparks' lawyer for advice.  (S. Cetta Dep., T. 8-9)  According to Steve Cetta,

Sparks' lawyers advised him that the letter from Dr. Zafar was "not official enough."

(S. Cetta Dep., T. 55, 64, 89)

On September 24, 2009, Kapovic sent a letter to Wakim acknowledging receipt of

Dr. Zafar's letter, but complaining that the letter was faxed, electronically signed, and was not on official letterhead.  Inexplicably, Kapovic's letter also stated as follows:

> Medicals forms are to be retrieved from the Restaurant Administrator and completed by a medical professional. Please be advised that the restaurant maintains short and long term disability policies, which may also be retrieved from the Restaurant Administrator.

 (Pechman Decl., Ex. 20).  As Dr. Zafar's letter to Sparks supported Wakim's accommodation request, Kapovic's reference to "medical forms" was a non sequitur. Indeed, even Steve Cetta did not know what forms Kapovic was referring to when he said in his September 24 letter "medical forms are to be retrieved from the restaurant administrator and completed by a medical professional."  (S. Cetta Dep., T. 24)

At around 3 p.m. on September 29, 2009, Wakim met with Sparks managers Kapovic, Musa Hoxhaj, Skender Cunjic, and Abdou Elshabeiny and requested that he be allowed to continue working as a runner.  (Wakim Aff., ¶13)  At the September 29 meeting, Wakim presented a letter requesting a reasonable accommodation and a doctor's note from Jabbar Zafar, M.D. (on letterhead) in support of that accommodation. (Wakim Dep., T. 60-61; Pechman Decl., Ex. 21)

In his September 29 letter, Wakim stated as follows:

> Dear Walter:
>
> This letter is submitted as my request for a reasonable accommodation, namely that I be permitted to continue in the position of runner, the function that I have performed at Sparks for the last eight years.  In support of my request, enclosed is the letter from Dr. Zafar dated September 22, 2009 which describes my physical and mental disabilities. As you know, I am suffering from severe anxiety and panic attacks at the thought of performing a front-waiter position. Moreover, the front-waiter position has more significant lifting and carrying functions than the position of runner. While I believe the front-waiter position entails a level of lifting that I am currently unable to perform adequately due to my shoulder, hand, and back problems (as well as my

anxiety), I am confident that I can continue to perform capably the duties of a runner.

I believe that I am entitled to the reasonable accommodation of performing the runner position rather than the front-waiter position. This right to a reasonable accommodation is provided for by way of the Americans with Disabilities Act, the New York State Human Rights Law, and the New York City Human Rights Law.

Please advise me as soon as possible if I may return to work this evening as a runner.

(Pechman Decl., Ex. 22)

The response of the managers to Wakim's request for a reasonable accommodation was that the rotation policy applied to everyone, including Wakim. (Wakim Dep., T. 61) The notable exception of course is Joanne Wejrowski -- establishing this as a classic case of disparate treatment. Wakim was not permitted to work as a runner on September 29, 2009 and, consequently, was effectively terminated as of that date. (Wakim Aff., ¶15)

Despite his effective termination, Wakim made one more plea to return to Sparks as a runner on October 13, 2009, in a letter sent in response to the letter from Kapovic regarding enrollment in COBRA:

Dear Walter:

As per your letter, I am returning my completed Option to Continue Group Health Insurance Coverage Form. I understand that because of the recent enactment of the American Recovery and Reinvestment Act of 2009, the first nine (9) months of COBRA eligibility may be available to me at a subsidized rate. Please advise me as soon as possible whether I am eligible for this reduced rate. Also your letter refers to an "enclosed Aetna Enrollment/Change Request Form" to submit to Aetna but no such form was attached. Please email me a copy of such form.

Because your letter states that I "quit" my job at Sparks "by failing to report to work since September 28, 2009," I want to make a few things clear for the record. The letter that I

handed you on September 29 merely requested a reasonable
accommodation.  I did not quit.  I only wanted to continue to
do the runner job as I have been doing for the last several
years.  Despite my physical ailments and my anxiety issues
which prevent me from performing a front-waiter job, I am
ready, willing, and able to perform my duties as a runner.

> Very truly yours,
> Ibrahim Wakim

(Pechman Decl., Ex. 24)

This assertion of Wakim's readiness and ability to work as a runner was ignored, as were his prior assertions.

## ARGUMENT

## POINT I

### PLAINTIFF'S FLSA AND NYLL RETALIATION CLAIMS MUST BE ALLOWED TO PROCEED BECAUSE DEFENDANTS CANNOT SHOW, AS A MATTER OF LAW, THAT PLAINTIFF WAS NOT DISADVANTAGED BY DEFENDANTS' REFUSAL TO EXEMPT HIM FROM THE ROTATION POLICY

Defendants argue that plaintiff's retaliation claim fails as a matter of law because plaintiff is judicially estopped from proving that defendants' institution of the Rotation Policy disadvantaged plaintiff in any way.  However, the evidence clearly shows that Wakim was ready, willing, and, most importantly, able to work as a runner at the time defendants instituted the Rotation Policy if only defendants had exempted him from having to take a turn as a front waiter.  It was not until January 2010, several months after defendants had effectively terminated plaintiff's employment by refusing to excuse him from the Rotation Policy, that Wakim applied for disability with the Social Security Administration.  Wakim Aff., ¶ 16.  Having been denied the position Wakim had held for 8 years and in which he had found methods of coping with his physical and mental impairments in order to continue doing, Wakim was left with no source of

support for himself and his family and availed himself of the one option left open to him. Defendants cannot escape liability for a clearly retaliatory action by virtue of plaintiff's misfortune.

Defendants' argument that their refusal to excuse Wakim from the Rotation Policy was not "an employment action disadvantaging the plaintiff" is based on the premise that "Plaintiff was adjudged by the SSA to be unable to work in any capacity as of September 7, 2009." Def's Mem. In Suppt. at 10. This judicial estoppel argument is insufficient to escape liability for retaliation under the FLSA.

Judicial estoppel applies to a party's position when:

> 1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) *the party asserting the two positions would derive an unfair advantage against the party seeking estoppel*."

*DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001)) (emphasis added).

It is this third factor, the premise that Wakim would gain an unfair advantage against Defendants, upon which Defendants' theory crumbles.[2] To the contrary, it is Defendants who would gain an unfair advantage over plaintiff should judicial estoppel apply because it would allow Defendants a "free pass" on a retaliatory action against Wakim, who, at the time it occurred, had not been found to be disabled by any agency and had not made any claims of total disability to defendants. In September 2009, Wakim had not yet been found to be disabled -- or even yet applied for disability -- and had in fact repeatedly asserted his ability to perform the runner duties supported by the medical opinion of Dr. Zaffar. Wakim Aff., ¶ 13; Zaffar Aff., ¶ 4. Wakim did not apply

---

[2] For the reasons previously stated in Plaintiff's opposition to Defendants' First Motion for Summary Judgment, Plaintiff maintains that the SSA's determination that he is totally disabled should not be given *any* res judicata effect, including as a bar to Plaintiff's disability discrimination claims as set forth in

to the SSA for disability benefits until in or about January 2010.  Wakim Aff., ¶ 16.  The SSA did not make a determination that Wakim was totally disabled until May 29, 2010. *Id.* at ¶ 18; Pastore Decl., Ex. A.  Accordingly, Defendants did not rely on any determination of total disability in September 2009 when they made the decision to deny Wakim's request for an accommodation.  *See Chevron Corp. v. Donziger*, No. 11 Civ. 0691 (LAK), 2012 U.S. Dist. LEXIS 107693 (S.D.N.Y. July 31, 2012) ("detrimental reliance on the statements or actions of the party against whom it is invoked is an essential element, and no such detrimental reliance has been demonstrated here.").  Likewise, a determination of total disability could not have factored into Defendants' analysis, if any, as to whether denying Wakim's request to remain a runner would give rise to a retaliation claim.

That the SSA, which Wakim only contacted because Defendants fired him from the only job he had known for more than thirty years, retroactively found Wakim to be totally disabled as of September 7, 2012, is irrelevant to the determination of whether Defendants's actions disadvantaged Wakim.  Wakim Aff., ¶ 17.  Rather, "[a]n employment action disadvantages an employee if 'it well might have dissuaded a reasonable worker from making or supporting [similar] charge[s] . . . .'" *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)) (internal quotations omitted).  A reasonable worker would be dissuaded from making a claim for unpaid wages by exposure to the disparate treatment which Wakim suffered, which is all that the law requires to find a disadvantageous action.

POINT II

**PLAINTIFF HAS ACTIONABLE DAMAGES FROM
DEFENDANTS' REFUSAL TO EXCUSE HIM FROM THE
ROTATION POLICY**

### A.  Wakim is Entitled to Mental Anguish Damages Under the FLSA and NYLL

Wakim would have been able to continue working for Defendants if his request to continue as a runner had been accommodated, giving rise to a claim for back pay. Wakim Aff., ¶ 17.  However, even if Defendants can successfully argue that Wakim would not have been able to continue working due to a disability thus barring back pay recovery, Wakim is entitled to recover compensatory damages for mental anguish under the anti-retaliation provisions of both the FLSA and NYLL.   Indeed, all of the retaliatory action complained of by Wakim occurred well before his January 2010 application for disability benefits.  Wakim Aff., ¶ 16.   Here, Defendants' failure to accommodate Wakim (like they did for Joanne Wejrowski), and their termination of Wakim from his runner position, caused Wakim severe emotional distress. The fact that Wakim filed for Social Security Benefits over the months after these retaliatory acts is no basis to preclude Wakim from his mental anguish damages.

In the Second Circuit, the district courts have awarded compensatory damages for mental anguish in FLSA and NYLL retaliation cases.  *See Smith v. Nagai*, 10-CV-8237, 2012 WL 2421740, at *4 (S.D.N.Y. 2012), adopted by, 2012 WL 2428929 (S.D.N.Y. 2012) ("Compensatory damages are also appropriate for the mental anguish suffered by Mr. Smith as a result of his retaliatory termination"); *see also Ting Yao Lin v. Hayashi Ya II, Inc.,* No. 08-CV-6071, 2009 WL 289653, at *7 (S.D.N.Y. 2009) (awarding damages pursuant to New York Labor Law § 215 for emotional distress as a result of retaliatory discharge); *see also Do Yea Kim v. 167 Nail Plaza,* No. 05 CV 8560(GBD), 2008 WL 2676598, at *6 (S.D.N.Y. 2008) (approving a jury award for $34,000 for compensatory damages for

pain, suffering, and mental anguish resulting from retaliatory termination under the FLSA); *see also Perez v. Jasper Trading, Inc.,* 05-CV-1725 (ILG)(VVP), 2007 WL 4441062, at *7 (E.D.N.Y. 2007) ("The plaintiff[s] are also entitled to compensatory and punitive damages for retaliation under New York Labor Law.); *see also Lai v. Eastpoint Int'l, Inc.,* 99 CIV 2095 (DLC), 2002 WL 265148, at *1 (S.D.N.Y. 2002) (Court awarded compensatory damages of $40,181 based on plaintiff's psychiatric injury attributable in part to defendant's retaliatory treatment).  *See also Moore v. Freeman*, 355 F.3d 558, 563 (6th Cir. 2004) ("the [FLSA] statutory scheme contemplates compensation in full for any retaliation employees suffer... and there is no indication that it would not include compensation for demonstrable emotional injures, as well as economic ones"); *Avitia v. Metropolitan Club*, 49 F. 3d 1219 (7th Cir. 1995) (affirming jury verdict awarding damages in FLSA case for emotional distress suffered as a result of retaliatory behavior).

**B.  Even If Plaintiff Has No Compensatory Damages, He Is Still Entitled To Punitive Damages**

**a.  The Cases Cited By Defendants Are Inapplicable**

None of the cases cited by defendants in support of their assertion that punitive damages cannot be awarded without compensatory damages directly involve FLSA and NYLL claims.  *See Artica v. J.B. Custom Masonry & Concrete, Inc.*, 2012 U.S. Dist. LEXIS 103272 (E.D.N.Y. Jul. 16, 2012) (holding that a jury award of $80,000 in punitive damages against defendant for assault and battery was proper even though the jury did not impose compensatory damages against that defendant, due to joint and several liability); *Virgilio v. City of New York*, 407 F.3d 105 (2d Cir. 2005) (holding that punitive damages in a personal injury case governed by New York's Air Transportation Safety and System Stabilization Act were barred if no compensatory damages were awarded);

17

*Action House v. Koolik*, 54 F.3d 1009 (2d Cir. 1995) (holding that the lower court's jury instructions in a tort and contract liability action "failed to inform the jury that it could not award punitive damages unless it also awarded compensatory damages.")

Accordingly, because plaintiff's claims for compensatory and punitive damages in this action stem from defendants' violations of the FLSA and NYLL, the cases cited by defendants are inapplicable.

### b. Punitive Damages Are Available Under The FLSA Even Where Compensatory Damages Are Not Awarded

In defendants' view, plaintiff's claim for punitive damages "fails as a matter of law." There is, however, no one common law rule. Whereas the requirement of actual damages has been described by commentators as the majority rule, *see Prosser & Keeton on the Law of Torts* § 2, at 14 (5th ed. 1984), it has also been sharply criticized, *see id*; *see also Restatement (Second) of Torts* § 908 cmt. (c) (1979) (("It is not essential to the recovery of punitive damages that the plaintiff should have suffered any harm, either pecuniary or physical.").

In New York federal courts, the lack of actual damages is irrelevant to the award of punitive damages. For example, in cases brought under Section 1983, the Second Circuit has held that punitive damages are available regardless of whether other damages have been awarded. *See King v. Macri*, 993 F.2d 294, 298 (2d Cir. 1993)(finding that "the punitive awards were not vitiated by the absence of compensatory or nominal damages awards."*); see also Robinson v. Cattaraugus County*, 147 F.3d 153, 161 (2d Cir. 1998)(holding that "punitive damages may be awarded even in the absence of a compensatory award.").

In *Cush-Crawford v. Adchem Corp.*, 271 F.3d 352, 357 (2nd Cir. 2001), the Second Circuit held that a Title VII plaintiff does not need to prove compensatory or nominal

damages to be awarded punitive damages.  The Court upheld a jury award of $100,000

in punitive damages, even though the plaintiff failed to establish any actual or nominal

damages on her claim, reasoning that despite the lack of actual harm, an employer

should not be able to escape liability for "malice" or "reckless indifference" to an

employee's rights.  *Id.* at 360.  The Second Circuit noted that, "the objectives of punitive

damages by definition differ from the objectives of compensatory damages."  *Id.* at 359.

The Second Circuit in *Cush-Crawford* further noted that, "the plain language of

the statute does not expressly state whether punitive damages are available absent an

award of actual damages."  Similarly, § 216(b) of the FLSA is silent on the issue of

whether punitive damages hinge on compensatory damages.  Notably, the statute

states, in part:

> [a]ny employer who violates the provisions of section
> 215(a)(3) of this title shall be liable *for such legal or equitable
> relief as may be appropriate to effectuate the purposes of section
> 215(a)(3) of this title, including without limitation* employment,
> reinstatement, promotion, and the payment of wages lost
> and an additional equal amount as liquidated damages.

29 U.S.C. §216(b) (2000) (emphasis added).

In this district, an employee can recover punitive damages under the anti-

retaliation provision of the FLSA, which provides that any employer who violates the

anti-retaliation provision of the FLSA is "liable for such legal or equitable relief . . .

including without limitation employment, reinstatement, promotion, and the payment

of wages lost and an additional equal amount as liquidated damages."  *See Sines v. Serv.*

*Corp. Int'l.*, No. 03 Civ. 5465, 2006 U.S. Dist. LEXIS 82164 (S.D.N.Y. Nov. 8, 2006); 29

U.S.C. § 216(b).

In reaching this conclusion, the Court in *Sines* found persuasive the Seventh

Circuit Court of Appeals decision in *Travis v. Gary Community Mental Health Center*, 921

F.2d 108 (7th Cir. 1990), *cert. denied*, 502 U.S. 812 (1991), which held that punitive damages were available under § 216(b) based on the history of statutory amendments, as well as the plain language of the statute.  In *Travis*, the Court found that, as amended, the provision indicated Congress's intent to give courts the discretion to grant whatever type relief were appropriate, including punitive damages.  *Id*. at 112.  The fact that Congress did "away with the old limitations without establishing new ones," but instead included the phrase "without limitation" indicated Congress's intent to leave to the courts the question of what types of relief are appropriate in a particular case.  *Id*. *See also Shea v. Galaxie Lumber & Constr. Co.*, 152 F.3d 729, 736 (7th Cir. 1998) ("We hold that punitive damages may be awarded on an FLSA § 216(b) retaliation claim even without a separate award of compensatory damages.")

*Sines* expressly declined to follow *Snapp v. Unlimited Concepts, Inc.*, 208 F.3d 928 (11th Cir. 2000), *cert. denied*, 532 U.S. 975 (2001), which held that punitive damages were not available under  § 216(b) based on the remedial scheme of § 216 and because the enumerated remedies under § 216(b) do not include punitive damages, but rather are compensatory in nature.  Because the Court determined that punitive damages are available under the FLSA, it did not need to reach the question whether punitive damages are available for retaliation actions under New York Labor Law.

Of equal import is the fact that, in civil law, punitive damages are a social exemplary "remedy," not a private compensatory remedy.  *Garrity v. Lyle Stuart, Inc.*, 40 N.Y.2d 354, 358 (N.Y. Ct. App. 1976).  The Supreme Court has held that "[p]unitive damages may properly be imposed to… punish[] unlawful conduct and deter[] its repetition."  *BMW of N. Am. v. Gore*, 517 U.S. 559, 568 (1995).  Indeed, they are designed to punish reprehensible conduct and to deter its future occurrence.  *See Smith v. Wade*, 461 U.S. 30, 41 (1983) (punitive damages "deter[s] persons from violating the rights of

others," and "encourage[s] private lawsuits seeking to assert legal rights.").

The FLSA was enacted for the purpose of protecting employees from their employers, by keeping the power of both entities balanced, and specifically making it unlawful for an employer to retaliate against an employee if that employee asserts his or her rights.  29 U.S.C. § 215(a)(3).  In essence, § 215(a)(3) provides a mechanism by which employees can facilitate and ensure the enforcement of the FLSA.  By interpreting § 216(b) to include punitive damages, not only is the purpose of the FLSA promoted, but also Congressional and public policy interests in punishing the unlawful conduct and deterring its repetition are achieved.

## CONCLUSION

For all the foregoing reasons, it is respectfully requested that defendants' motion for summary judgment should be denied in its entirety.

Dated:  New York, New York
        February 19, 2013

                                        BERKE-WEISS & PECHMAN LLP


                                        By: ___s/_____
                                            Louis Pechman (LP-6395)
                                            Jessica N. Tischler (JT-1582)
                                            488 Madison Avenue, 11th Floor
                                            New York, NY 10022
                                            *Attorneys for Plaintiff*

TO:   Timothy J. Pastore, Esq.
      Chad Naso, Esq.
      Duval & Stachenfeld LLP
      101 Park Avenue, Eleventh Floor
      New York, NY 10178
      *Attorneys for Defendants*